UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRANSPORTES COAL SEA DE VENEZUELA C.A.,

                Petitioner/Cross-Respondent,

     -v-

SMT SHIPMANAGEMENT & TRANSPORT LTD.,

             Respondent/Cross-Petitioner.

Case No. 05-CV-9029 (KMK)

OPINION and ORDER

---

APPEARANCES:

Mark C. Flavin, Esq.
Flavin & O'Brien
New York, NY
*Counsel for Petitioner*

John P. Vayda, Esq.
Nourse & Bowles, LLP
New York, NY
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

      Transportes Coal Sea de Venezuela ("TCSV") brings this action seeking vacatur of a July 28, 2005 arbitration award favoring SMT Shipmanagement & Transport Ltd. ("SMT"). SMT cross-petitions the Court to confirm the arbitration award and correct SMT's name which appears incorrectly as "Ship Management & Transport of Limassol" on both arbitration and court documents. For the reasons stated below, the petition to vacate the arbitration award is DENIED, and the cross-petition to confirm the award and to correct SMT's name as it appears on court and arbitration documents is GRANTED.

I.  Background

     In February 2001, SMT, a Cypriot commercial and technical ship management company, attempted to load coal destined for Somerset, Massachusetts onto the Somerset, a vessel under its control.  (Petr.'s Mem. of Law ("Petr.'s Mem.") 2; Respt.'s Mem. of Law in Opp'n to Pet./Mot. to Vacate Award of Arbitrators ("Respt.'s Mem.") 2-3.)  SMT employed TCSV, a Venezuelan coal barging company, to tow coal via barges to the Somerset, which lay in the waters of Lake Marcaibo, Venezuela.  (Aff. of Rahul Wanchoo ¶ 4.)  Equipment on the Somerset was then employed to transfer the coal from TCSV's barges onto the Somerset.  (Verified Pet. to Vacate Arbitral Award ("Verified Pet.") ¶ 2.)  During the coal transfer operation one of TCSV's barges, the TCSV-2, sank.  (Petr.'s Mem. 2.)  TCSV sought to hold the Somerset responsible for the TCSV-2's sinking and subsequently arrested the Somerset when it returned to Venezuela in April 2001.  (Aff. of Paul E. O'Brien in Supp. of Pet. to Vacate Arbitration Award ("O'Brien Aff.") ¶ 11.)

     SMT's underwriter, the Swedish Club, was responsible for insuring the Somerset.  This included directing and paying for SMT's legal actions worldwide.  (O'Brien Aff. ¶ 5; Petr.'s Mem. 2; Respt.'s Mem. 3.)  Following the Somerset's arrest, the Swedish Club agreed to provide a guarantee of $1,100,000 on behalf of SMT and the Somerset in return for the Somerset's release.  (Aff. of Rahul Wanchoo ¶ 4.)  Additionally, SMT permitted the Swedish Club to execute an arbitration agreement on its behalf with respect to the sinking of the TCSV-2, providing that the arbitration would take place in New York and "be tried by three arbitrators or a single arbitrator if agreed amongst the parties."  (O'Brien Aff. Ex. B; Aff. of Rahul Wanchoo Ex. A.)  A letter to this effect appears to be the only memorialization of any arbitration agreement

2

between TCSV and SMT or the Swedish Club.  (*Id.*)

Each side appointed an arbitrator, with TCSV nominating Manfred Arnold ("Arbitrator Arnold") and SMT nominating Louis Sheinbaum ("Arbitrator Sheinbaum").  (Aff. of Mark C. Flavin ("Flavin Aff.") ¶ 4.)  Arbitrator Arnold and Arbitrator Sheinbaum selected Raymond Burke, Jr. ("Arbitrator Burke") to serve as the third arbitrator.  Following selection, each arbitrator affirmed in writing that he knew of nothing that could impair his "ability to render an unbiased award solely on the basis of the evidence presented."  (O'Brien Aff. ¶ 14.)

Arbitrator Sheinbaum has practiced admiralty law for over forty years and was a founding member of the admiralty law firm Waesche, Sheinbaum & O'Regan.  (*Id.* ¶ 6.)  William Bennett, another admiralty lawyer, and Stephen Sheinbaum, Arbitrator Sheinbaum's son, practiced with Arbitrator Sheinbaum for a number of years at this firm.  (*Id.* ¶ 8.)  Subsequently, both Stephen Sheinbaum and William Bennett founded and practiced at the firm Sheinbaum, Bennett, Giuliano, McDonnell & Levy, LLP ("Sheinbaum, Bennett, Giuliano").  (O'Brien Aff. ¶¶ 7, 8.)

After eleven evidentiary hearings extending from July 2002 to March 2004, followed by oral argument on July 15, 2004, the arbitration panel denied and dismissed TCSV's claims against SMT and the Somerset.  (Flavin Aff. ¶¶ 6, 8; O'Brien Aff. Ex. J 1.)  The decision, dated July 28, 2005, awarded SMT all attorneys' and arbitrators' fees and disbursements plus interest from the date of the award.  (O'Brien Aff. Ex. J.)  The panel was split, however, with Arbitrator Arnold dissenting in an opinion that questioned the credibility of SMT's witnesses.  (O'Brien Aff. Ex. J Final Award App. A 7-11.)

Following the arbitration award, counsel for TCSV learned that SMT, through the Swedish Club, had hired Sheinbaum, Bennett, Giuliano to represent them in a separate,

concurrent arbitration (the "Brussel Arbitration") between SMT and a third, unrelated party. (O'Brien Aff. ¶ 24.)  That arbitration proceeding began in May 2003 and continued throughout the duration of the TCSV-SMT arbitration (the "Somerset Arbitration") and subsequent Final Award.  (Petr.'s Mem. 3.)

The Swedish Club assigned the Brussel Arbitration to a Swedish Club "handler," Helena Dahlsten ("Dahlsten").  As a handler, Dahlsten's responsibilities included assessing the strength of liability claims, which sometimes required her to employ specialized attorneys.  (Affirmation of Helena Wallerius Dahlsten ("Dahlsten Aff.") ¶¶ 3-4.)  Dahlsten, not familiar with New York arbitration practice, contacted the Swedish Club's United States general correspondent in New York, Atlantic Marine Associates, Inc. ("AMA"), to obtain a referral for a law firm experienced in the practice.  (*Id*. at ¶ 7.)

Dahlsten affirmed that the AMA member she contacted, Michael Mitchell, a personal friend and trusted business associate, was familiar with New York arbitration.  He, in turn, recommended Bill Bennett and Nick Giuliano of Sheinbaum, Bennett, Giuliano to represent the Swedish Club, and thus SMT, in the Brussel Arbitration.  (Affirmation of Michael J. Mitchell ¶ 8.)  In formulating his recommendation, Michael Mitchell considered the backgrounds, caseload, and experience of a number of attorneys.  (*Id*.)  Before receiving the recommendation, Dahlsten had never heard of Bill Bennet or Nick Giuliano or the firm Sheinbaum, Bennett, Giuliano.  (Dahlsten Aff. ¶ 9.)  Also, Dahlsten was not aware that these attorneys worked with the son of an arbitrator in the Somerset Arbitration.  (*Id*. at ¶ 9.).

On October 24, 2005, following the Somerset Arbitration panel's Final Award, TCSV filed a verified petition to vacate the arbitration award.  In its answer dated December 30, 2005,

SMT opposed TCSV's request and cross-petitioned this Court to confirm the panel's Final Award and correct SMT's name as it appears on that award.  (Petition to Correct and Confirm Arbitration Award.)  On December 22, 2005 the Parties agreed to correct the Final Arbitration Award so that "Ship Management & Transport of Limassol" is in each and every place corrected and changed to read "SMT Shipmanagement & Transport Ltd."  (Stipulation Correcting Name of Party in Arbitrators' Award 2.)  The Court held oral argument on November 21, 2006.

## II.  Discussion

### A.  Standard of Review

Under the Federal Arbitration Act, (the "FAA") a court may vacate an arbitration award "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption in the arbitrators . . . ; (3) where the arbitrators were guilty of . . . misbehavior by which the rights of any party have been prejudiced; or (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."  9 U.S.C. § 10(a).

Courts are hesitant to vacate arbitration awards.  *See Andros Compania Maritima, S.A. v. Marc Rich & Co., A.G.*, 579 F.2d 691, 700 (2d Cir. 1978).  Indeed, if suspicious or disgruntled parties were permitted to seize upon pretexts for invalidating such awards, they would undermine the benefits of arbitration.  *Id*. at 700-01 (noting that arbitrations are quicker, less expensive and less formal than court proceedings); *see also Commonwealth Coatings Corp. v. Continental Casualty Co.*, 393 U.S. 145, 151 (1968) (White, J., concurring).  However,  arbitrators, who are often chosen directly from the niche business communities whose disputes they are called upon to arbitrate, may have pre-existing relationships with one or both of the parties to an arbitration,

or another arbitrator.  As the Second Circuit has noted, "expertise in an industry is accompanied by exposure . . . to those engaged in it, and the dividing line between innocuous and suspect relationships is not always easy to draw."  *Andros*, 579 F.2d at 701.  Despite this concern, the Second Circuit has endorsed the use of experts as arbitrators and, as noted by the panel in *Andros,* it has "not been quick to set aside the results of an arbitration because of an arbitrator's alleged failure to disclose information."  *Id.* at 700; *see also Int'l Produce, Inc. v. A/S Rosshavet,* 638 F.2d 548, 552 (2d Cir. 1981) (noting that the frequent disqualification of arbitrators that are drawn from expert business communities would disrupt entire maritime arbitration system).

With these concerns at the forefront, courts have decided that to vacate an award because of evident partiality, a challenging party must show that "a reasonable person would have to conclude that an arbitrator was partial to one party to the arbitration."  *Lucent Techs., Inc. v. Tatung Co.*, 379 F.3d 24, 31 (2d Cir. 2004) (quoting *Morelite Constr. Corp. v. N.Y. City Dist. Council Carpenters Benefit Funds*, 748 F.2d 79, 84 (2d Cir. 1984)); *see also Skyview Owners Corp. v. SEIU, Local 32BJ*, No. 04 Civ. 4642, 2004 WL 2244223, at * 4 (S.D.N.Y Oct. 5, 2004).  The mere "appearance of bias does not satisfy the standard of evident partiality."  *Sanford Home for Adults v. Local 6, IFHP*, 665 F. Supp. 312, 320 (S.D.N.Y. 1985); *see also Canadian Aviation Simulator Servs. Inc. v. Thales Training & Simulation, Ltd*., No. 06 Civ. 1911, 2006 WL 1975932, at *4 (S.D.N.Y. July 13, 2006) (quoting *Sanford*, 665 F. Supp. at 320).  Rather, to set aside an arbitration award for arbitrator partiality, "the interest or bias [of the arbitrator] . . . must be direct, definite and capable of demonstration rather than remote, uncertain, or speculative."  *Sanford*, 665 F. Supp. at 320 (internal quotations and citations omitted); *see also Canadian Aviation*, 2006 WL 1975932, at *4; *Nat'l Hockey League Players' Ass'n v. Bettman*, No. 93 Civ.

5769, 1994 WL 738835, at *12 (S.D.N.Y. Nov. 9, 1994) (Report and Recommendation);

*Pompano-Windy City Partners, Ltd. v. Bear, Stearns & Co.*, 698 F.Supp. 504, 516 (S.D.N.Y.

1988); *Sidarma Societa Italiana di Armamento Spa, Venice v. Holt Marine Indus., Inc*., 515 F.

Supp. 1302, 1307 (S.D.N.Y. 1981).  This inquiry depends on the particular facts and

circumstances of each case.  *See Morelite*, 748 F.2d at 81.

        In evaluating the alleged interest and bias of an arbitrator, courts examine several factors:

"(1) the financial interest the arbitrator has in the proceeding; (2) the directness of the alleged

relationship between the arbitrator and a party to the arbitration proceeding; (3) and the timing of

the relationship with respect to the arbitration proceeding."  *Sanford*, 665 F. Supp. at 320; *see

also Lucent*, 379 F.3d at 31; *Sun Ref. & Mktg. Co. v. Statheros Shipping Corp*., 761 F. Supp. 293,

299 (S.D.N.Y. 1991).

        B.  Discussion

        TCSV alleges that the Final Arbitration Award should be vacated for three reasons.  First,

TCSV argues that Arbitrator Sheinbaum's son's connection to the Brussel Arbitration (through

Sheinbaum, Bennett, Giuliano) resulted in Arbitrator Sheinbaum's having an indirect financial

interest in the Somerset Arbitration. (Petr.'s Mem. at 9.)  Second, TCSV contends that Arbitrator

Sheinbaum's connection to SMT and the Swedish Club through his son's status as a partner in a

firm representing them in a separate arbitration, as a matter of law, merits a finding of evident

partiality.  (*Id*. at 8.)  Third, TCSV claims that Arbitrator Sheinbaum's son had an undisclosed

business relationship with SMT and the Swedish Club that developed during the Brussel

Arbitration that affected Arbitrator Sheinbaum during the Somerset Arbitration.  This

relationship, according to TCSV, favors a finding that Arbitrator Sheinbaum was biased.  (*Id.* at 9.)

### 1.  Arbitrator's Financial Interest

TCSV maintains that Arbitrator Sheinbaum had a financial interest in the Somerset Arbitration because his son's law firm represented SMT in the Brussel Arbitration.  (Petr.'s Mem. 7.)  According to TCSV, this financial interest allegedly stemmed from two sources.  First, TCSV claims that Arbitrator Sheinbaum became a creditor of his son when, on June 15, 2005, he provided $50,000 as bond after his son's indictment in an unrelated criminal proceeding.  (Flavin Aff. ¶ 12.)  According to TCSV, the additional fees generated by Sheinbaum, Bennett, Giuliano could finance Arbitrator Sheinbaum's son's repayment of the money that his father used in posting bail.  (Petr.'s Mem. 9.)  Second, TCSV asserts that Arbitrator Sheinbaum's financial stake in the Somerset Arbitration created a "desire to financially benefit his son, and help generate additional fees for his son in the Brussel Arbitration." (*Id.*)

SMT counters that because no direct financial relationship is alleged between Arbitrator Sheinbaum and SMT, the party to the arbitration, there are no grounds for finding bias.  Further, SMT contends that no indirect relationship existed between SMT and Arbitrator Sheinbaum immediately before the parties received the Final Award because Arbitrator Sheinbaum's son was not associated with Sheinbaum, Bennett, Giuliano after February 2005, four months prior to the arbitrators' submission of the Final Award.  As a result, SMT claims that Arbitrator Sheinbaum's son had no direct or indirect financial interest in either the Brussel Arbitration or

the Somerset Arbitration.[1]   (Affidavit of William R. Bennett, III ("Bennett Aff.") ¶ 11.)  Thus, SMT argues that Arbitrator Sheinbaum had no indirect financial interest in SMT or the Swedish Club at the time of the Final Award.

In order to set aside an arbitration award on the basis of an arbitrator's purported financial interest, as noted, the alleged interest must be "direct, definite, and capable of demonstration rather than remote, uncertain, or speculative."  *Canadian Aviation*, 2006 WL 1975932, at *4; *see also Sanford*, 665 F. Supp. at 320 ("To set aside an award for arbitrator partiality, the interest or bias . . . must be direct, definite and capable of demonstration rather than remote, uncertain, or speculative.").  Courts in this District have found the requisite financial interest when an arbitrator has a personal or business interest adverse to, hinging upon, or otherwise directly related to, a party to the proceeding.  *See Sun Ref. & Mktg. Co.*, 761 F. Supp. at 293; *Sidarma*, 515 F. Supp. at 1307.  For instance, in *Sun Refining*, the court vacated an arbitration award in part because one of the arbitrators served as president of a company concurrently involved in a separate arbitration matter with the petitioner.  761 F. Supp at 303.  The court found significant the arbitrator's personal and adversarial involvement in the other proceeding both as a witness and as representative of Sun's adversary.  *Id*.  In particular, the arbitrator "negotiated and signed

---

[1] TCSV claims that Arbitrator Sheinbaum's son served as either counsel or a partner at the firm after February 2005.  Specifically, TCSV's counsel has submitted an affidavit in which he states that he called Sheinbaum, Bennett, Giuliano in August 2005 and asked to speak with Arbitrator Sheinbaum's son. (Reply Affidavit of Mark C. Flavin ¶ 28.)  Counsel was informed that Arbitrator Sheinbaum's son no longer worked for the firm.  (*Id*.)  However, upon further inquiry, counsel claims to have been informed that Arbitrator Sheinbaum's son was "counsel" to the firm. (*Id*.)  Further, counsel for TCSV submits that as late as November 2005, "Martindale's reported that [Arbitrator Sheinbaum's son] was in someway affiliated with his former partners" at Sheinbaum, Bennett, Giuliano.  (*Id*.)  Even if true, there is no evidence that Arbitrator Sheinbaum's son worked on the Brussel Arbitration or stood to directly benefit from it.

9

the contract which was the subject of [that] arbitration, testified as a witness on behalf of Sun's adversary, and represented that adversary in the separate arbitration." *Id*.

Here, the relationship in question is much more attenuated. TCSV can identify no direct connection between Arbitrator Sheinbaum and SMT or the Swedish Club. Instead, the alleged relationship is imputed to Arbitrator Sheinbaum through his son's similarly tenuous connection to these parties. In other words, Arbitrator Sheinbaum himself did not have an adversarial relationship with TCSV. Nor is it alleged that Arbitrator Sheinbaum received any direct compensation from or engaged in any business with SMT outside of the contested arbitration. And, even if Arbitrator Sheinbaum's son stood to gain from Sheinbaum, Bennett, Giuliano's representation of SMT in the Brussels Arbitration, a proposition in itself unsubstantiated, it does not follow that Arbitrator Sheinbaum stood to gain financially, either directly or indirectly, from fees SMT might have paid to his son's law firm. Thus, Arbitrator Sheinbaum's son's involvement with SMT differed substantially from the relationship between the arbitrator and the arbitration party in *Sun Refining & Market Co.*

TCSV, however, argues that the Supreme Court's opinion in *Commonwealth Coatings*, 393 U.S. 145 (1968), holds that *any* "past financial relationship . . . is a valid ground for challenge to an arbitration award." (Petr.'s Mem. 4-5.) In *Commonwealth Coatings*, the Supreme Court vacated an arbitration award where a party to an arbitration proceeding was a regular client of a sitting arbitrator's consulting business and paid significant fees directly to the arbitrator. TCSV correctly points out that the plurality held that arbitrators must avoid even the appearance of bias. *Id.* at 150. However, two concurring justices found such a standard too strict and three dissenting justices reasoned that since the decision of all three arbitrators was

unanimous, the appearance of bias with respect to the third arbitrator did not warrant overturning the award.  *Id.* at 150-55.

      While TCSV's interpretation of *Commonwealth Coatings* is supported by the decisions of several other circuits,[2] the Second Circuit has declined to interpret the decision to mean that any appearance of financial interest by the arbitrator is enough to vacate an arbitration award.  *See Morelite*, 748 F.2d at 82-84 (explaining that the Supreme Court's attempt in *Commonwealth Coatings* to determine what standard applies in construing evident partiality has resulted in ongoing uncertainty and holding that something more than the appearance of bias is required to demonstrate evident partiality); *Int'l Produce,* 638 F.2d at 551 (explaining that Justice White's concurrence in *Commonwealth Coatings* narrowed the plurality opinion and disassociated the concurring justices' from the 'appearance of bias' language of the plurality); *Andros*, 579 F.2d at 699-700 ("The diverse views expressed in these opinions pose difficulties in applying the teachings of *Commonwealth Coatings.*").  Indeed, the Supreme Court's opinion focuses on an arbitrator's failure to disclose a financial relationship and whether those circumstances mandate vacatur of an arbitration award.  In their divergent opinions, the justices appeared to have agreed only that "[d]isclosure by arbitrators should be encouraged."  *Andros*, 579 F.2d at 699; *see also Cook Indus. Inc. v. C. Itoh & Co.*, 449 F.2d 106, 108 (2d Cir. 1971) ("[T]he Supreme Court in

---

[2] *See Positive Software Solutions, Inc. v. New Century Mortgage Corp*., 436 F.3d 495, 502 (5th Cir. 2006) ("[A]n arbitrator selected by the parties displays evident partiality by the very failure to disclose facts that might create a reasonable impression of the arbitrator's partiality.  The evident partiality is demonstrated from the nondisclosure, regardless of whether actual bias is established"); *Schmitz v. Zilveti*, 20 F.3d 1043, 1047 (9th Cir. 1994) ("Justice White's [concurrence] does not . . . require rejection of language such as 'appearance of bias' . . . .  The *Commonwealth Coatings* court reversed precisely because the arbitrator's business relationship with one of the parties reasonably created an 'appearance of bias.'").

*Commonwealth Coatings* emphasized the importance of an arbitrator disclosing to the parties any

dealings that might create an impression of possible bias." (internal quotations omitted));

*Garfield & Co. v. Wiest*, 432 F.2d 849, 853 (2d Cir. 1970) ("*Commonwealth Coatings* teaches

that when parties agree to arbitration, the arbitrators, in order to avoid even the appearance of

bias, must disclose any nontrivial dealings with one party which are not known to the other

party."). Thus, in the Second Circuit, *Commonwealth Coatings* has been interpreted to require "a

case-by-case approach in preference to dogmatic rigidity" when deciding petitions to vacate

arbitration awards. *Andros*, 579 F.2d at 700; *see also Lucent*, 379 F.3d at 28 (noting that the

Second Circuit has employed a case-by-case approach to findings of "evident partiality" as

opposed to "dogmatic rigidity"). Even after *Commonwealth Coatings*, the balance of case law in

the Second Circuit supports the proposition that when a purported financial interest or financial

relationship between an arbitrator and a party to arbitration is indirect, general or tangential,

courts should not vacate arbitration awards. *See e.g.*, *Sidarma*, 515 F. Supp. at 1306-07 (refusing

to vacate an arbitration award because no evidence revealed the arbitrators' considerations of

personal or business interests.).

    For instance, in *International Produce*, 638 F.2d 548 (2d Cir. 1981), petitioners sought to

have an arbitration award vacated. A presiding arbitrator served as vice president of a company

which had a client that was represented by the same law firm representing a party in the contested

arbitration. As the arbitration proceedings went forward, the arbitrator was eventually put "in the

position of being a non-party witness in a suit between parties who were represented by the same

law firms that were [representing parties] appearing before him" in the contested arbitration. *Id*.

at 550. The court nonetheless refused to vacate the award, finding that the interaction between

arbitrator's client and counsel for a party to the arbitration to be insufficient to merit vacation of the award.  In reaching this conclusion, the court reasoned that the alleged bias in the arbitration proceeding "did not involve either of the parties [to the contested arbitration].  By happenstance, it did involve the same law firms, but the arbitrator's role was only that of a witness who testified and was cross-examined by" a lawyer for the firm representing a party to the contested arbitration.  *Id*. at 551.  The court concluded that "the record [was] completely bare of anything remotely resembling 'evident partiality.'"  *Id.*

In *Transmarine Seaways Corp. v. Marc Rich & Co. A. G.*, 480 F. Supp. 352 (S.D.N.Y. 1979), the court refused to vacate an arbitration award when it was discovered that one arbitrator had represented another company which asserted a claim (entirely unrelated to those at bar) against a party to the contested arbitration.  *Id.* at 358.  The court found the indirect financial and business relationship between the suspect arbitrator and the party to the arbitration "far too tenuous a relationship to require the disqualification of an experienced and respected maritime arbitrator."  *Id*.  The court reasoned that "no one could 'reasonably' conclude that [the contested arbitrator] was biased against [the party challenging the arbitration].  His participation in the prior, unrelated litigation [was] far too remote; and there [was] a total absence of that direct financial relationship, between arbitrator and a party to the arbitration, towards which *Commonwealth Coatings* and its progeny direct their particular attention."  *Id*.

TCSV's claim concerning Arbitrator Sheinbaum's alleged financial interest is even more tenuous than those described in these cases.  In particular, his alleged connection to SMT through his son is far too remote to amount to an interest in either the Brussel Arbitration or the Somerset Arbitration.  For Arbitrator Sheinbaum, unlike the arbitrator in *Transmarine Seaways Corp.*, is

not alleged to have had a relationship with a third party embroiled in a dispute with a party to the arbitration where he sat as arbitrator. Nor is he alleged to have interacted with Sheinbaum, Bennett, Giuliano in any type of adversarial setting. Further, he is not alleged to have considered the impact that the Somerset Arbitration Award might have on his business or his own financial well-being. Indeed, the alleged financial interest is even more removed: TCSV would have this court vacate the award because Arbitrator Sheinbaum's son's former colleagues are counsel in a dispute between a party to this arbitration and a third party in an unrelated matter. The cases in this jurisdiction do not support such a determination.

Finally, this Court finds wholly unpersuasive TCSV's claim that Arbitrator Sheinbaum's posting bail for his son amounted to a financial interest in the Brussel Arbitration. Contrary to TCSV's spin, the posting of bail was not a loan from father to son. Instead, the money posted by Arbitrator Sheinbaum went directly to the court to be held as security for his son's future appearance. (Affidavit of Louis P. Sheinbaum ¶ 12.) Thus, the court would return the money posted assuming no violations of the bail terms. (*Id*.) Therefore, it is unsurprising that TCSV provides no evidence to suggest that Arbitrator Sheinbaum's son would apply fees from the Brussel Arbitration towards repaying his father for a loan. Accordingly, the Court finds that Arbitrator Sheinbaum had no financial interest in the outcome of the Somerset Arbitration.

## 2. Directness of Relationship Between Arbitrator and Party

In making its case alleging Arbitrator Sheinbaum's partiality, TCSV relies heavily on Arbitrator Sheinbaum's father-son relationship with a (possibly former) partner at Sheinbaum, Bennett, Giuliano, the firm handling SMT's Brussel Arbitration. (Petr.'s Mem. 8.) TCSV

maintains that the existence of this relationship mandates a finding of evident partiality and requests this Court vacate the arbitration award.  (*Id.*)

There is little case law that discusses whether and to what extent a familial relationship between an arbitrator and a party merits vacating an arbitration award.  As the Second Circuit has acknowledged, some "specific areas [of business] tend to breed tightly knit professional communities.  Key members are known to one another, and in fact may work with, or for, one another, from time to time."  *Morelite*, 748 F.2d at 83.  However, familial relationships are frequently particularly close and often evoke inherent prejudices stronger than those that result from long experience in a particular industry.  *Id*. at 83-85.  Recognizing these potentially competing propositions, as well as the strong federal policy in favor of leaving arbitration awards undisturbed, courts employ a fact-based analysis to determine the existence of a familial relationship between an arbitrator and a party to an arbitration and whether such a relationship presents sufficient evidence of partiality to vacate an arbitration award.  *Cf. id.* at 85.

Generally, cases in this and other circuits suggest that familial relationships between an arbitrator and a party are likely to merit vacation of an arbitration award.  For instance, in *Morelite*, the court found a father-son relationship between an arbitrator and the president of an arbitration party's national umbrella organization merited vacating the arbitration award.  *See id.* Knowing no details of the relationship between father and son, the court felt bound by its "strong feeling that sons are more often than not loyal to their fathers, partial to their fathers, and biased on behalf of their fathers," and therefore could not "in good conscience allow the entering of an award grounded in what [they] perceive[d] to be such unfairness."  *Id.* at 84.  The court thus

concluded "that reasonable people would have to believe it provide[d] strong evidence of partiality by the arbitrator." *Id*. at 85.

Conversely, familial relationships only tangentially related to an arbitration, such as those between an arbitrator and a non-party to an arbitration, would not *per se* cause a reasonable person to conclude that an arbitrator was partial to one party, absent additional circumstances. For instance, in *Local 814, International Brotherhood of Teamsters v. J&B System Installers & Moving, Inc.*, 878 F.2d 38 (2d Cir. 1989), the court refused to vacate an award where an arbitrator had, in a separate incident, allegedly gone to jail for contempt rather than testify against the father of a party to the arbitration. The plaintiff argued that, as the arbitrator had gone to jail rather than testify against the arbitration party's father, the arbitrator would also be biased toward the son. The court reasoned that the connection between arbitrator and the arbitration party at issue in *International Brotherhood*, though still involving a father-son relationship, "[was] more attenuated than [the relationship] in *Morelite Construction Corp*." *Id.* at 40. It held that the speculation that a close friendship between the party's father and the arbitrator "might suffice to show an appearance of bias . . . it falls short of [the] 'reasonable person' standard." *Id.*

In *Morelite*, the directness and nature of the arbitrator's relationship to a party to the arbitration was substantially different from the relationship between Arbitrator Sheinbaum and SMT. There, the arbitrator's father was the president of a national union whose local chapter was a party to the arbitration. Here, the arbitrator's son had no direct ties to the matter before the arbitration panel, as Arbitrator Sheinbaum's son was not representing SMT in the Somerset Arbitration. Additionally, while it is implicit in the court's decision in *Morelite* that the arbitrator was aware of his father's status as President of the national union that was a party

16

before him, there is no evidence in this case that Arbitrator Sheinbaum was aware that his son's firm was representing SMT in the Brussel Arbitration.  It is by no means difficult to believe that Arbitrator Sheinbaum was unaware of all the legal matters that made up his son's practice (let alone his son's firm's practice) and without evidence of that knowledge, there is no basis to conclude that Arbitrator Sheinbaum was even aware of the alleged conflict.  Finally, there is no evidence linking the Brussel Arbitration to the Somerset Arbitration.  In *Morelite*, father and son were involved in the same matter.  Here, Sheinbaum, Bennett, Giuliano assisted SMT in a matter wholly separate from the Somerset Arbitration.  Sheinbaum, Bennett, Guiliano's interests as counsel to SMT in the Brussel Arbitration were not aligned with SMT's interests in the Somerset Arbitration, and there is nothing that links the two arbitrations, other than the fact that SMT was a party in both.  Thus, as in *Local 814*, the relationship between the arbitrator and the party is much more attenuated then the father-son relationship at issue in *Morelite.*

Other courts have emphasized that the directness of the relationship between the family member and the suspect arbitrator is significant.  For instance, in *Norwood v. Bennett Composites*, No. 02-MC-0046, 2004 WL 1895193, at *5 (E.D. Pa. Aug. 24, 2004), the court refused to vacate an arbitration award because an arbitrator failed to disclose that his son fraternized with a key member of a corporation that appeared as a party to the father's arbitration. The court reasoned that the alleged relationship was not one between an arbitrator and a party, but was a step removed and thus should be accorded little significance in proving the arbitrator's evident partiality.  The court noted that the petitioner sought "to impose a theory of 'vicarious partiality' by charging a father with the knowledge of his son, but there is no precedent for such a theory to vacate an arbitration award where the father served as arbitrator."  *Id*.

As in *Norwood*, the contested relationship here is not between the arbitrator and an employee or officer of SMT.  Nor is the asserted relationship between the arbitrator and a member of a subsidiary, parent or affiliate of SMT.  Instead, TCSV seeks to capitalize on the even more attenuated relationship between Arbitrator Sheinbaum and his son's law firm, which was representing SMT in a concurrent but unrelated matter.  As the court indicated in *Norwood*, while the relationship between father and son may be assumed a close one, there is no precedent for imposing vicariously the potential partiality of one on the other.  *Id*.

Additionally, the Court finds it significant that federal judges, who are held to a more stringent standard of impartiality under the Judicial Code and Judiciary Law, *see Morelite*, 748 F.2d at 83 ("[T]he standards for disqualification of arbitrators have been held to be less stringent than those for federal judges."); *Areca, Inc. v. Oppenheimer & Co*., 960 F. Supp. 52, 56 (S.D.N.Y. 1997) ("[T]he Second Circuit has adopted less stringent standards for disqualification of arbitrators than for federal judges."), are free to hear cases in which a party is represented in unrelated matters by the law firms of family members.  Even under these more stringent standards, for example, a claim that a judge's spouse is "a partner in a firm which represented [a party appearing before the judge] and that, as a result of this relationship, [the judge] and her husband benefitted from fees from that client" describes a chain of causation too attenuated to reasonably question a judge's impartiality.  *Canino v. Barclay's Bank PLC*, No. 94 Civ. 6314, 1998 WL 7219, at *3-4 (S.D.N.Y. Jan. 7, 1998); *see also In re Billedeaux,* 972 F.2d 104, 105-06 (5th Cir. 1992) (recusal unnecessary under where judge's husband's law firm represented defendant in "many other cases"); *In re Hathaway Ranch Partnership*, 116 B.R. 208, 213-16 (C.D. Cal. 1990) (recusal unnecessary where judge's wife's law firm represented bankruptcy

debtor in other matters); *Diversifoods, Inc. v. Diversifoods, Inc.*, 595 F. Supp. 133, 133-39 (N.D. Ill. 1984) (recusal unnecessary under where judge's husband's law firm represented defendant in other matters).  Thus, it would stand to reason that an arbitrator may not be deemed partial simply because he presides over an arbitration in which one party employs an arbitrator's family member's law firm, particularly where that family member had no role in the unrelated litigation.

### 3. Disclosure and Timing

Finally, TCSV claims that SMT's retention of Sheinbaum, Bennett, Giuliano in the Brussel Arbitration amounted to an undisclosed relationship between Arbitrator Sheinbaum's son and SMT and the Swedish Club.  (Petr.'s Mem. 10.)  This relationship and its timing, according to TCSV, weighs in favor of this Court's finding evident partiality.  (*Id*.)

Countering this assertion, SMT argues that no relationship existed between Arbitrator Sheinbaum's son and SMT or the Swedish Club.  Instead, SMT argues, that the Swedish Club retained Bill Bennett and Nick Giuliano of Sheinbaum, Bennett, Giuliano, on a personal recommendation, to represent the SMT (and thus the Swedish Club's interests) in the Brussel Arbitration.  Arbitrator Sheinbaum's son performed no work on the matter.  Further, SMT argues that these lawyers' representation of SMT and the Swedish Club lacked even the appearance of a business relationship between Arbitrator Sheinbuam and SMT and the Swedish Club as Arbitrator Sheinbaum's son announced his departure from Sheinbaum, Bennett, Giuliano in February 2005, four months before the arbitrators rendered their decision in the Somerset Arbitration.  (Bennett Aff. ¶ 11.)  On leaving, his partnership interest was paid through March 31, 2005.  (*Id*.)

"Federal common law requires that an arbitrator make full disclosure to all the parties of

any significant business relationships with any of the parties before appointment as an arbitrator is final." *Sun Ref. & Mktg. Co.*, 761 F. Supp. at 300.  Failure to make such disclosure may "justify setting aside an award." *Sanford*, 665 F. Supp. at 317.  However, the "Second Circuit has not been quick to set aside the results of an arbitration because of an arbitrator's failure to disclose information." *Canadian Aviation*, 2006 WL 1975932, at *4 (quoting *Andros*, 579 F.2d at 700); *see also Lucent*, 379 F.3d at 30 (noting that there is no *per se* rule requiring vacatur of an arbitration award whenever an arbitrator's undisclosed relationship is discovered as some undisclosed relationships are too insubstantial to warrant vacating the award); *Skyview*, 2004 WL 2244223, at * 5 (finding that an arbitrator had no duty to disclose a former business relationship between the arbitrator and a partner of a firm representing a party to the arbitration).

Here, TCSV's allegation focuses on Arbitrator Sheinbaum's failure to disclose his son's relationship with SMT through the son's law firm.  Assuming *arguendo* that Arbitrator Sheinbaum's son had a relationship with SMT and that Arbitrator Sheinbaum was aware of the relationship, both unsubstantiated assumptions, TCSV cites no case supporting the proposition that Arbitrator Sheinbaum bears any responsibility for disclosing the relationship.  While *Morelite* and its progeny encourage arbitrators' disclosure of relationships between arbitrators and parties, there is no similar caselaw requiring that arbitrators disclose others' relationships with parties to an arbitration proceeding.

Further, while the parties disagree over the existence of any relationship between SMT, the Swedish Club, and Arbitrator Sheinbaum's son, both parties submit that SMT's involvement with Sheinbaum, Bennett, Giuliano began during (rather than prior to) the Somerset Arbitration,

and thus could not be disclosed prior to the arbitration.  (O'Brien Aff. ¶¶ 6, 9.)  Thus, any alleged

vicarious relationship between SMT and Arbitrator Sheinbaum could not be disclosed prior to

the Somerset Arbitration.  Finally, there is no evidence that, during the Somerset Arbitration,

Arbitrator Sheinbaum or his son was aware of Sheinbaum, Bennett, Giuliano's relationship with

SMT or the Swedish Club in the Brussel Arbitration.  Without allegations regarding knowledge

of the developing relationship, Arbitrator Sheinbaum would not be able to disclose the

relationship.  Thus, this court finds that Arbitrator Sheinbaum did not fail in his duty to disclose.


### III. Conclusion

For the reasons described above, Petitioner's motion to vacate the arbitration award is DENIED,

and SMT's cross-motion to confirm the arbitration award is GRANTED.  Further, as both parties

have stipulated that Respondent's name appears incorrectly in the arbitrators' Final Award and

both parties agree that Respondent's correct name is "SMT Shipmanagement & Transport Ltd.,"

Respondent's cross-petition to correct its name as it appears in the arbitrators' Final Award is

GRANTED.  The Clerk of the Court is directed to close this case.


SO ORDERED.

Dated:          January 9, 2007
                New York, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

21

Service List:
Mark C. Flavin, Esq.
Flavin & O'Brien
67 Wall Street, Suite 2507
New York, NY 10005
Tel: (212) 248-2200
Fax: (212) 248-2270

John P. Vayda, Esq.
Nourse & Bowles, LLP
29 Exchange Place
New York, NY 10005
Tel: (212) 952-6200
Fax: (212) 952-0345